In re Freddie I. BARKER, d/b/a JDW Ranch, Sharlene R. Barker, Debtors.

No. 03–12543 HRT.

United States Bankruptcy Court, D. Colorado.

Oct. 21, 2003.

Theodore P. Demos, Denver, CO, for Debtors.

### ORDER

HOWARD R. TALLMAN, Bankruptcy Judge.

This case comes before the Court on First Pioneer National Bank's Motion to Require Trustee to Abandon Property of the Estate.

### Facts

1. Mr. Barker is a 60 year old rancher who has engaged in farming and ranching in Colorado during all of his adult life.

2. First Pioneer Bank [the "Bank"] has a security interest in all of Debtors' property to secure the indebtedness owed to the Bank by Debtors.

3. Operation of Debtor's ranching business does not generate sufficient income to allow Debtors to service their secured debt, therefore, Debtors anticipate surrendering the collateral and discontinuing their business.

4. On August 5, 2003, this Court entered an order granting the Bank relief from the automatic stay with respect to all of its collateral with the exception of approximately $57,000.00 cash [the "Cash"] in the hands of the Trustee.

5. In addition to the Cash, the Bank's collateral consists principally of real estate, farm equipment, cattle and crops [the "Non-cash Collateral"].

6. Pursuant to an agreement between the Debtors and the Bank, Debtors are attempting to produce buyers for the Non-cash Collateral which was the subject of the Court's August 5, 2003, lift of stay order.

7. The farm machinery which serves as part of Bank's Non-cash Collateral has been fully depreciated over time.

8. Debtors estimate that liquidation of all of the Bank's Non-cash Collateral will result in a total federal and state capital gains tax liability of approximately $185,901.00. No tax-

ing authorities are currently creditors of the estate.

9. Upon sale of the Bank's Non-cash Collateral, the Debtors do not expect to receive any portion of the sale proceeds. All proceeds will go to the Bank to satisfy its lien.

10. To date, Trustee has not moved to abandon any of Bank's collateral, but he does support the Bank's Motion.

## Discussion

A hearing on the Bank's Motion was held on August 26, 2003. At that time, Trustee argued that he should not be required to abandon the Cash which he holds. The parties agree that the Bank's security interest extends to the Cash as it represents proceeds from the Bank's collateral. However, Trustee argued that, until the Bank's Non-cash Collateral is liquidated, the extent of the estate's interest, if any, in the Cash cannot be determined. Also, the Bank and Debtors informed the Court that the Bank has agreed to refrain from foreclosing on its Non-cash Collateral at this time in order to allow Debtors to have an opportunity to liquidate the collateral themselves. The Court directed the Bank to submit a status report to the Court on or before November 28, 2003, and is holding any decision on abandonment of the Cash in abeyance.

With respect to the Non-cash Collateral, the Court directed the parties to submit briefs in support of their positions. Those positions can be briefly summarized as follows:

1. Notwithstanding the fact that it was the Bank which raised this issue, it takes no position with respect to the Non-cash Collateral. The Bank's purpose in filing the Motion was to obtain abandonment of the Cash proceeds which are in the hands of the Trustee.

2. Trustee favors abandonment. He has chosen to administer an estate in this case in the hope that the Bank's lien may be satisfied upon sale of the Non-cash Collateral without consuming all of the Cash proceeds which he is holding. Trustee hopes to make a distribution to creditors from those proceeds. However, if abandonment is denied, then upon foreclosure or other sale of the Bank's Non-cash Collateral, the capital gain liability generated from such sale would fully consume every dime of proceeds not necessary to satisfy the Bank's lien. Trustee argues that if the Court does not allow abandonment in this case, then he is the only party that stands to benefit from administration of this estate.

3. The Debtors argue against abandonment. If the Non-cash Collateral is abandoned, the Debtors would be responsible for the capital gain liability generated by the foreclosure or other sale of the collateral. To be saddled with over $180,000.00 in tax liability after the conclusion of their bankruptcy case would render the "fresh start" promised by the Bankruptcy Code utterly illusory.

From the Bank's brief, it appears that the focus of the Bank, and its real concern with respect to this Motion, is the Cash in the hands of the Trustee. However, the Bank's Motion was not so limited. Consequently, it raises the issue of abandonment of the Non-cash Collateral. Regardless of the fact that the stay has been lifted as to the Non-cash Collateral, it remains property of the estate. *See, e.g. Catalano v. C.I.R.*, 279 F.3d 682, 686 (9th Cir.2002); *Providian National Bank v. Vitt (In re Vitt)*, 250 B.R. 711, 716 n. 5

(Bankr.D.Colo.2000) (Judge Brooks). Whether or not that property remains property of the estate is an important question with significant ramifications and deserves due consideration by this Court.

 Pursuant to § 554(b), "On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(b). None of the parties have argued, and there is no evidence, that the Non-cash Collateral represents any benefit to the bankruptcy estate. The Court finds that the Non-cash Collateral is of inconsequential value and benefit to the estate. Consequently, there can be no question that the Court may order the Non-cash Collateral to be abandoned pursuant to § 554(b).

Nonetheless, the Court does need to address the Debtors' argument that it should not order abandonment of the Non-cash Collateral because such abandonment would serve to shift a tax burden away from the estate and onto the shoulders of the Debtors who came to the bankruptcy court expecting to emerge from the bankruptcy process cleansed of their indebtedness and ready to embark on their promised "fresh start."

The difficulty arises due to the tax consequences that flow from foreclosure of property which has a low tax basis. The difference between the income realized from the disposition and the lower basis results in a taxable capital gain. 26 U.S.C. § 1001; *In re Barry,* 48 B.R. 600, 609 (Bankr.M.D.Tenn.1985). Of course, in the context of a typical foreclosure, there is no "income" to the Debtors in the ordinary sense. Post-bankruptcy, they don't even have a personal liability that will be discharged by the foreclosure. Nonetheless, IRS Regulations provide that, even where the mortgage holder no longer has recourse against the individual taxpayer, the amount of the liability secured by property disposed of is charged as income to the taxpayer. 26 C.F.R. § 1.1001–2(a)(4)(i). Accordingly, a sale of such property will yield a capital gain which is recognized by the owner of property at the time of the sale in the tax year in which the sale takes place. *Helvering v. Hammel,* 311 U.S. 504, 512, 61 S.Ct. 368, 372, 85 L.Ed. 303 (1941). As far as taxation of that gain is concerned, it makes no difference whether the transfer of the property results from a traditional sale of the property or through foreclosure of a lien against the property. Where such property is fully encumbered by liens, or nearly so, the owner of the property may see little or none of the sale proceeds and will need to pay the resulting taxes from other resources. *In re Perlman,* 188 B.R. 704, 708 (Bankr.S.D.Fla. 1995) ("Whether a taxpayer personally receives money from a taxable transaction is inconsequential for income tax purposes.").

The transfer of property into the bankruptcy estate is not a taxable event, so no tax liability is generated upon filing of the case. 26 U.S.C. § 1398(f)(1); *In re Perlman,* 188 B.R. at 708. Similarly, transfer of property out of the estate, through closure of the estate or through abandonment of property, creates no tax liability. 26 U.S.C. § 1398(f)(2); *Samore v. Olson (In re Olson),* 100 B.R. 458, 463 (Bankr. N.D.Iowa 1989). But, when estate property is sold, that transaction is a taxable event and the estate takes on the tax attributes of the debtor, including the low basis of the property.

If the Trustee were to keep the property in the estate and allow the foreclosure to take place while the property is part of the estate, then the bankruptcy estate becomes liable for the tax on the capital gain that would result from the foreclosure sale.

Conversely, if this Court orders the estate to abandon the Non-cash Collateral, that property is abandoned back to the Debtors. If a foreclosure or other sale takes place after abandonment, then the capital gain tax issue becomes the Debtors' problem.

There can be no doubt that it is a bitter pill to endure a business failure followed by a bankruptcy proceeding and to come out the other end owing a $185,901.00 capital gains tax debt. But the alternative is to order the Trustee to retain assets that: 1) are certainly of no benefit to unsecured creditors of the estate; and 2) represent a positive burden to the estate's unsecured creditors. If the Non-cash Collateral is not property of the estate at the time a foreclosure or other sale takes place, then there is at least the theoretical possibility[1] that some portion of the Cash will be available for distribution to creditors by the Trustee. If the Trustee does retain those assets, then it is certain that every penny of the Cash, not subject to the Bank's lien, will be consumed in the payment of the capital gains tax. Thus, even the theoretical possibility of a distribution to unsecured creditors evaporates if the property is not abandoned. So, the question boils down to whether the extraordinary burden which the Debtor's will suffer if the property is abandoned provides a justification for this Court to ignore the clear language and intent of the § 554. The Court thinks not.

"One of the primary goals of the Bankruptcy Act is 'to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.'"

*Matter of Esgro, Inc.,* 645 F.2d 794, 797 (9th Cir.1981) (quoting *Williams v. United States Fidelity & Guaranty Co.,* 236 U.S. 549, 554–55, 35 S.Ct. 289, 59 L.Ed. 713 (1915)). It has even been said that, in addition to the trustee's duty to fairly and expeditiously administer the estate, the trustee also has a general duty not to unduly burden the debtors' fresh start. *In re Laymon,* 1989 WL 252447 (D.Minn., July 25, 1989).

That said, this Court is constrained to follow the law as it is written. The requirements of § 554 are relatively modest and are easily satisfied in this case. The only possible justification under the Bankruptcy Code for the Court to grant the Debtors the relief that they seek is for the Court to resort to its equitable powers under 11 U.S.C. § 105. But the Court's powers under § 105 are strictly confined to carrying out the provisions of the Bankruptcy Code. *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."). "That statute does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law." *U.S. v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986). Section 105 simply does not empower the Court to address every possible injustice that may arise as a result of the administration of a case under the Bankruptcy Code. That is the function of Congress and not of this Court. The reality is that, under the statutes as they are currently constituted, the Debtors "fall within that unfortunate group that Con-

---

1. The Court is acutely aware of the hypothetical nature of this discussion. The reality is that, if the sale of the Non-cash Collateral fails to net sufficient proceeds, the entire amount of the proceeds which the Trustee holds may be applied to satisfy the Bank's lien and this matter will be rendered quite academic.

gress has declared cannot be absolved of all economic sins and truly be born again." *In re Burpo*, 148 B.R. 918, 920 (Bankr. W.D.Mo.1993) (Judge Koger).

In accordance with the foregoing discussion, it is

**ORDERED** that First Pioneer National Bank's Motion to Require Trustee to Abandon Property of the Estate is hereby GRANTED.